# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

Crim. Nos. 20-232 (JRT/DTS)

Plaintiff,

v.

AMONDO ANTOINE MILLER, TASHENA LAVERA CRUMP, AND BALLAM HAZEAKIAH DUDLEY,

**ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN PART DEFENDANTS' POST-TRIAL MOTIONS**

Defendants.

---

Melinda A. Williams, Harry Jacobs, Matthew S. Ebert, and Garrett S. Fields, **UNITED STATES ATTORNEY'S OFFICE,** 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

Robin M. Wolpert, **SAPIENTIA LAW GROUP PLLC**, 120 South Sixth Street, Minneapolis, MN 55402, for Defendant Amondo Antoine Miller; Caitlinrose H. Fisher and Matthew D. Forsgren, **FORSGREN FISHER**, Capella Tower, 225 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Defendant Tashena Lavera Crump; and Donald M. Lewis, Esq., 1550 East Minnehaha Parkway, Minneapolis, MN 55417, and Kathleen K. Curtis, **NILAN JOHNSON LEWIS**, 250 Marquette Avenue South, Suite 800, Minneapolis, MN 55401, for Defendant Ballam Hazeakiah Dudley.

Following a nearly monthlong trial, a jury found Defendants Amondo Antoine Miller, Tashena Lavera Crump, and Ballam Hazeakiah Dudley guilty of conspiracy to commit mail fraud and various acts of mail and wire fraud. Miller, Crump, and Dudley each move for judgments of acquittal, or alternatively, for new trials. Because the government did not carry its burden to prove the charged email in Count 26 crossed state

lines, the Court will grant Miller's motion for acquittal of Count 26.  The Court will also defer judgment on portions of Crump's motion for a new trial until she has an opportunity to fully brief potential discovery and *Brady* issues.  With those exceptions, the Court will find the evidence was sufficient to sustain the convictions, again reject the Defendants' legal challenges to the jury instructions, and conclude that a new trial would not promote the interests of justice.

## BACKGROUND

For brevity's sake, the Court will recount only the broad strokes of the fraudulent conspiracy and the Defendants' roles therein.  A United States grand jury indicted 43 defendants in a nationwide conspiracy to defraud individuals by representing that the coconspirators would renew or reduce the cost of existing magazine subscriptions and instead sign victims up for new subscriptions.  (Indictment ¶ 1–2, Oct. 20, 2020, Docket No. 15.)  There were two genres of enterprises in the scheme: "lead list" brokers, who would buy and sell lists of vulnerable individuals with existing magazine subscriptions, and telemarketing call centers that would execute the fraud.  (*Id.* ¶ 7–8.)

Miller was a lead broker through Power Sales & Marketing and ran a telemarketing operation, Magazine Solutions.  (*See, e.g.*, Tr. Vol. VI at 24–25, Docket No. 2031.)  Crump was the general manager of the call center at Readers Club Home Office ("RCHO"), where she worked as RCHO owner Brian Williams's "right hand," handling "all the day-to-day operations."  (*Id.* at 39; Tr. Vol. IX at 209–10, 212, Docket No. 2034.)  Dudley was a

telemarketer at Central Subscription Services ("CSS") and Westside Readerz.  (Tr. Vol. IX at 194–96.)

## DISCUSSION

### I. STANDARD OF REVIEW

Rule 29 permits the Court to enter a judgment of acquittal after a guilty verdict if the evidence is insufficient to sustain the conviction.  Fed. R. Crim. P. 29(c)(2).  The standard for determining whether evidence is insufficient is strict, requiring acquittal only where there is "no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999).  The Court "consider[s] the evidence in the light most favorable to the government, drawing all reasonable inferences and resolving all evidentiary conflicts in favor of the jury's verdict."  *United States v. Aponte*, 619 F.3d 799, 804 (8th Cir. 2010).

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The Court has broad discretion to grant a new trial under Rule 33, but it must exercise that discretion sparingly.  *United States v. McClellon*, 578 F.3d 846, 857 (8th Cir. 2009).  The Court should grant a motion for a new trial "where the evidence presented weighs heavily enough against the verdict that the court believes a 'miscarriage of justice may have occurred.'  Unlike a motion for acquittal, . . . a court considering a new trial motion is free to evaluate the

evidence and credibility of the witnesses." *United States v. Hilliard*, 392 F.3d 981, 987 (8th Cir. 2004) (quoting *United States v. Huerta-Orozco*, 272 F.3d 561, 565 (8th Cir. 2001)).

## II.   SUFFICIENCY OF THE EVIDENCE

The Defendants each move for judgments of acquittal, or in the alternative, for new trials, on each count of conviction.  Apart from Count 26, the evidence weighs in favor of the jury's verdict.[1]  Accordingly, the Court will deny the Defendants' Rule 29 and 33 motions as to all counts besides Count 26.

The Court will note at the outset that the government introduced copious evidence supporting the convictions.  While the Court will focus in this order on the narrow issues raised by Defendants in their post-trial motions, the backdrop of coconspirator testimony, victim testimony, fraudulent scripts, lead lists, other documentary evidence seized from Defendants' places of business, undercover recordings, and victim bank statements cannot be ignored.  The evidence established the Defendants' guilt of the various counts beyond a reasonable doubt.

### A.   Conspiracy

No Defendant disputes there was a nationwide conspiracy to defraud hundreds of thousands of victims out of hundreds of millions of dollars for fraudulent magazine

---

[1] The Court will analyze the sufficiency of the evidence under Rule 33's more defendant-friendly standard of review.  Because Defendants are not entitled to a new trial under Rule 33, neither are they entitled to acquittal under Rule 29.

subscriptions. Rather, the Defendants claim they did not knowingly and willfully join that nationwide conspiracy. Those contentions are belied by the evidence.

### 1.  Miller

Miller first argues that the sales scripts seized from Magazine Solutions varied from the sales pitch identified in the indictment, showing that he did not partake in the charged conspiracy. But even if the specific language was different, the message and strategy were the same. His employees also testified that they employed those scripts in a fraudulent manner at Miller's instruction. And even if, *arguendo*, Miller was not criminally liable for his conduct at Magazine Solutions, he still partook in the conspiracy as a lead broker through Power Sales & Marketing.

Miller's lead lists from Power Sales & Marketing were seized from dozens of co-conspirators' offices. He nonetheless asserts that selling lead lists cannot form the basis of conspiracy liability because the lists were not per se illegal, and he did not know they would be used to commit fraud. As to the first argument, an action does not have to itself be illegal to form the basis of conspiracy liability; it is enough that the action was taken to further an illegal conspiracy. *Cf. United States v. Hermes*, 847 F.2d 493, 495–96 (8th Cir. 1988). As to the second, the jury was entitled to reasonably infer from the evidence presented that Miller knew the leads would be used to commit fraud, especially given his experience running a telemarketing operation that used lead lists to commit fraud. *See United States v. Lawson*, 483 F.2d 535, 536–38 (8th Cir. 1973) (direct evidence of intent is rarely available and may be proved by circumstantial evidence).

### 2.  Crump

Like Miller, Crump argues that the sales scripts from RCHO varied from other fraudulent scripts.  As with Miller, the Court finds that the scripts evince a common purpose and strategy to defraud consistent with the nationwide conspiracy.  Crump also argues that she did not know the full extent of the conspiracy, so cannot be guilty of the charged conspiracy.  But "[o]nce the government established the existence of the conspiracy," which Crump does not dispute, "only slight evidence linking [Crump] to that conspiracy was required to support [her] conviction." *United States v. Reeves*, 83 F.3d 203, 206 (8th Cir. 1996); *see also Blumenthal v. United States*, 332 U.S. 539, 557 (1947) (a defendant need not know all the details nor all the participants to be convicted of conspiracy).  Crump conspired with Brian Williams to run RCHO.  And she conspired with others outside RCHO to buy and sell lead lists and further the fraudulent scheme, including at minimum, testifying codefendants Wayne Dahl, Daniel Klibanoff, James Sierra, and Jared Michelizzi.

### 3.  Dudley

Finally, Dudley, like Crump, argues there is no evidence he knew of and agreed to join a nationwide conspiracy.  He argues that, at most, the government proved he knowingly joined a smaller conspiracy at CSS while remaining ignorant of the broader conspiracy.  Again, Dudley did not have to know every detail of the conspiracy's extent to have knowingly joined it.  *Reeves*, 83 F.3d at 206; *Blumenthal*, 332 U.S. at 557.  The jury was instructed that it could not convict if the government only proved multiple separate

conspiracies.  The jury reasonably found from Dudley's testifying coconspirators and former coworkers that Dudley knowingly joined the charged conspiracy.

### B.    Mail and Wire Fraud

Because the government did not introduce any evidence showing that the email underlying the wire fraud in Count 26 crossed state lines, the Court will grant Miller's motion for acquittal as to that count.  Because the jury's convictions otherwise aligned with the weight of the evidence, the Court will deny the Defendants' motions as to all other counts.

#### 1.   Miller

The government's substantial proof of the illegality of the overall scheme does not relieve it of its burden to prove each element of each charged offense beyond a reasonable doubt.  Before this case went to the jury, the Court dismissed two counts against Miller.  Count 21 was dropped by party agreement, while the Court granted Miller's Rule 29 motion for acquittal of Count 32 because the government failed to introduce evidence of a wire communication on or around the charged date.  (*See* Tr. Vol. XV at 7-8, 341-42, Docket No. 2040.)

Count 26, of which Miller was convicted, suffers a similar technical deficiency. Count 26 charges Miller with wire fraud for causing an email to be transmitted from John Harbert III in New Mexico to Eric Stephen Esherick in Minnesota on or about August 15, 2018.  (Indictment at 21, 24.)  Notably absent from the trial record, though, are Esherick's whereabouts at any time on or around August 15, 2018.  (*See, e.g.*, Tr. Vol. IX at 254–55

(describing Harbert's, but not Esherick's, location); Tr. Vol. V at 159–61, Docket No. 2030 (locating Esherick in San Diego around 2008 or 2009, and Minnesota around 2013).)

To sustain a conviction of wire fraud, the government must prove beyond a reasonable doubt that an interstate communication was transmitted.  *See* 18 U.S.C. § 1343.  Indeed, it is the interstate component that allows Congress to criminalize wire fraud in the first instance.  *See United States v. Jinian*, 725 F.3d 954, 965 (9ᵗʰ Cir. 2013). Without knowing Esherick's location, there would have been no way for the jury to know whether the email from Harbert crossed state lines.

In post-trial briefing, the government does not claim to have introduced any evidence about Esherick's location.  Rather, it now alleges that the message must have crossed state lines when passing through Google's servers in California.  But it did not introduce any evidence about Google's server locations, nor did it advance that theory to the jury.[2]  It does not even provide citations to which the Court could take judicial notice, assuming for argument's sake that would be appropriate, that all emails sent via Gmail pass through California.  *But see* Fed. R. Evid. 201(f) (judicial notice not conclusive in a criminal case).  The Court readily acknowledges that it is unlikely that Harbert, Esherick, and the Google servers all were in New Mexico at the time of the email.  But the

---

[2] Such evidence would not allow conviction in any event.  The government may not change the interstate connection charged in the indictment (that is, that the email passed from New Mexico to Minnesota) without going back to the grand jury.  *See Stirone v. United States*, 361 U.S. 212, 217–19 (1960) (finding submission to the jury of an uncharged theory of an action's interstate ties unconstitutional).

government cannot satisfy its burden by relying on likelihoods, unsupported by evidence. It must prove each element beyond a reasonable doubt. Accordingly, the Court will grant Miller's Motion for Acquittal of Count 26.

At the same time, the Court will sustain Miller's wire fraud convictions under Counts 11, 15, and 18. Counts 11 and 15 concern the transmission of lead lists to a coconspirator, Jared Michelizzi. Miller contends that because he was not familiar with Michelizzi's operation, he could not have known that the lead lists would be used to further a fraudulent scheme. But given the substantial evidence about how the telemarketers within the conspiracy operated—including Miller's own telemarketers—the jury reasonably concluded that Miller either knew or was willfully blind to the fact that the lead lists would be used in a fraudulent scheme.

Miller also claims that the government did not introduce sufficient evidence to prove a material falsehood in the message communicated to the victim in Count 18. But given the pervasive falsehoods that would be communicated during a sale at Magazine Solutions and given that the telemarketer who closed this sale testified that he never used a "truthful pitch" while working for Miller, the jury reasonably concluded that Miller caused a material falsehood to be communicated to the victim. (Tr. Vol. VII at 86, Docket No. 2032.)

Finally, Miller contends that it was inappropriate for the jury to find that each conviction of wire fraud victimized ten people over the age of 55. Per Miller, the

government did not prove that any of his individual wire communications victimized ten or more seniors.  But the government simply needed to prove that the scheme that those wire communications furthered victimized ten or more seniors, not that each individual wire communication had that effect.  *See* 18 U.S.C. §§ 1343, 2326.  The government met its burden through the testimony of ten senior victims, as well as credit card statements and lead lists targeting many more.

        **2.    Crump**

Crump first defends against her convictions by claiming that the scripts used by RCHO were literally true.  RCHO's sales script communicates: "We were just calling to check up on the magazines, was everything arriving on time and in good condition for you?  Great, we wanted to help you by keeping you at OUR lowest price today."  (*See* Def.'s Renewed Mot. for J. Acquittal at 8, Jan. 4, 2024, Docket No. 2150 (emphasis in original).)  The Court finds the pitch includes a "fraudulent misrepresentation or promise, or concealment of material facts, reasonably calculated to deceive a reasonable person." (*See* Instructions to the Jury ("Jury Instructions") at 71, Nov. 3, 2023, Docket No. 2007.) Any reasonable person would assume that a telemarketer calling to check up on "the magazines" and "keep[]" the recipient at a low price was the recipient's current magazine provider.  Consistent with the overall scheme, Crump's actions at RCHO were "reasonably calculated" to trick victims into thinking they were talking to their current magazine providers and not signing up for new subscriptions.

Crump also claims her engagement of CompliancePoint is inconsistent with an intent to defraud.  Crump repeated that point ad nauseam to the jury, and the jury rejected that inference.  Crump's coconspirator testified that compliance firms were used as a would-be get out of jail free card, to give their operations a veneer of legitimacy.  The intent was to provide cover, not to ensure she was not perpetrating fraud.  In any event, Crump's argument is analogous to an advice of counsel defense, which is only appropriate when the advisee provides all material facts to the counselor.  *See United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006).  Crump's witness from CompliancePoint testified that Crump withheld numerous pieces of information that would have been "red flags" had she properly disclosed them.  (Tr. Vol. XV at 82–83, 92–93.)

### 3.   Dudley

Broadly, Dudley contends that he did not know his sales scripts were untruthful nor that he was contributing to a fraudulent enterprise while working as a telemarketer for CSS.  But his coconspirators—both indicted and unindicted—uniformly testified that it was obvious within a shift or two that the operation was fraudulent.  Recordings also revealed Dudley creating clean recordings to sell new subscriptions to undercover agents.  The jury reasonably concluded that Dudley must have either known or been willfully blind to the fraud occurring every day when he went into work.

As to Counts 6 and 41 specifically, Dudley claims that he accurately represented that he was calling from Phylis Schreier's magazine company because she had earlier issued payment to another CSS salesperson.  Dudley's argument relies on the technicality

that by the time the call got to him, a colleague had already defrauded Schreier.  Because

it was obvious that every sale CSS made was infected by fraud, Dudley knew that he was

not calling from Schreier's magazine company as she would have understood that phrase.

The Court will not credit Dudley's argument that he was literally telling the truth because

he was revictimizing Phylis Schreier rather than making an initial, fraudulent sales call.  In

any event, as the Court instructed the jury, it is not necessary that the mailing or wire

communication "was itself false or fraudulent."  (Jury Instructions at 68, 73.)  Rather, the

Defendant must have used or caused to be used a mailing or wire communication in the

**scheme** to defraud.  (*Id.*)  Dudley's repeat communications, all in furtherance of the

scheme to defraud Schreier, each form a separate basis for liability.[3]

Dudley also claims there is insufficient evidence that he was involved in the wire

communication from Count 41, when his coworker Eric McGarrity contacted Schreier.

McGarrity called Schreier to send her another bill, and that call was bookended by

communications from Dudley.  As the Court instructed the jury, it is not necessary "that

the defendant send or receive the actual wire communication or specifically intend that

a wire communication be used.  It is sufficient if a wire communication was in fact used

to carry out the scheme and the use of a wire communication by someone was reasonably

foreseeable.  (*Id.* at 73.)  Where Dudley and McGarrity were working closely together in

---

[3] Dudley makes the same argument against Count 23, claiming that Jonathan Petersen would have technically been an existing CSS subscriber.  The Court will no more credit Dudley's argument with respect to Petersen than it will with respect to Schreier.

-12-

the same scheme to defraud Schreier, the Court will sustain Dudley's conviction for a call placed by McGarrity because Dudley could have reasonable foreseen the use of a wire communication to further the scheme.

Finally, Dudley argues Count 23 is unsupported because the fraudulent credit card charge was processed by a coworker. But where CSS's records reflected that Dudley was the salesperson and verifier on the call, the jury could find beyond a reasonable doubt that the credit card charge was reasonably foreseeable.

## III.   CONSUMER COMPLAINTS

Throughout trial, the government introduced consumer complaints from the Better Business Bureau and state attorneys general to prove defendants were on notice and had knowledge of the fraudulent scheme. Because the complaints were introduced to prove notice or knowledge and not the truth of the matters within the complaints, they were admissible non-hearsay. *See* Fed. R. Evid. 801(c); *United States v. Farkas*, 935 F.2d 962, 965 (8ᵗʰ Cir. 1991). The Court rejected Crump's motion in limine to exclude the consumer complaints and issued two limiting instructions to the jury cautioning the appropriate use of the consumer complaints—only for their effect on the recipient.[4]

Crump now attacks the government's reference to the complaints as improper hearsay. She seems to primarily take issue with the fact that the government referenced

---

[4] (*See* Minutes at 3, Sept. 29, 2023, Docket No. 1887; Tr. Vol. X at 182–83, Docket No. 2035; Tr. Vol. XVI at 182–83, Docket No. 2041.)

the contents of the complaints and characterized the contents as descriptions of fraud. But the content is relevant to the complaints' notice function. The point is not just that Crump was on notice that RCHO was receiving consumer complaints, but also that she was on notice of complaints of fraud. To be sure, there is often a thin line between hearsay and non-hearsay purposes of evidence. But the government did not cross that line, particularly when coupled with the Court's limiting instructions.

## IV.    LEGAL ISSUES

Aside from sufficiency of the evidence, the Defendants challenge the Court's instructions to the jury and the constitutionality of the mail and wire fraud statutes as applied to their conduct. As it did during trial, the Court will reject those objections.

### A.    Willful Blindness

First, the Defendants contest the Court's willful blindness instruction, which matches the Eighth Circuit model. (*See* Jury Instructions at 76); Manual of Model Crim. Jury Instructions for the 8th Cir., § 7.04. A willful blindness instruction "is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." *United States v. Hayes*, 574 F.3d 460, 475 (8th Cir. 2009) (quoting *United States v. Woodard*, 315 F.3d 1000, 1004 (8th Cir. 2003)). As discussed, the government presented substantial evidence that the Defendants knew of the fraudulent conduct. Nonetheless, each Defendant pleaded their ignorance—Crump and Dudley through their testimony, and all three through their theory of defense instructions. (*See*

Jury Instructions at 78–80.)  The Court correctly determined that the evidence supported giving the willful blindness instruction to the jury.

The Defendants protest that the model willful blindness instruction may have misled the jury about the requisite mens rea.  But a jury is not "led to convict a defendant improperly on a negligence standard where, as here, the instruction states the jury must not conclude the defendant had knowledge of criminal activity if he was simply careless or negligent."  *United States v. Whitehill*, 532 F.3d 746, 752 (8th Cir. 2008).  The Court's instruction, as modeled by the Eighth Circuit, took the appropriate precautions to ensure the jury understood the appropriate mens rea.

### B.    Mail and Wire Fraud Instructions

The Defendants contend the Court erred by refusing to alter the Eighth Circuit's model instructions for mail and wire fraud.  Specifically, they believe the following language should have been added:

> A person is not deprived of a property interest if they receive what they paid for, even if they made a purchase as a result of a material false representation.  Nor is a person deprived of a traditional property interest simply because they, as a result of a material false representation, entered into a transaction that they would rather avoid.

(*See, e.g.*, Tashena Crump's Proposed Jury Instructions at 37, 42, Sept. 18, 2023, Docket No. 1776.)

The Defendants primarily argue the Court should have supplemented the Eighth Circuit's model fraud instructions in the wake of *Ciminelli v. United States*, 598 U.S. 306

-15-

(2023).[5] There, the Supreme Court held that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." *Id.* at 309. *Ciminelli* faulted the trial court for instructing that "the term 'property' in § 1343 'includes intangible interests.'" *Id.* at 311. Here, the Court issued no such instruction. To the contrary, the Court instructed that a "'scheme to defraud' includes any plan or course of action intended to deceive or cheat another out of **property** by employing material falsehoods. It also means the obtaining of **money or property** from another by means of material false representations or promises." (Jury Instructions at 66, 71 (emphasis added).) In no way did the Court suggest to the jury that anything but tangible property rights could underly a conviction.

In truth, *Ciminelli* is an awkward fit that teaches little of relevance to this case. *Ciminelli* was a public corruption case in which the defendant paid off influential figures to ensure preferential treatment in contracting with a state-associated nonprofit. 598 U.S. at 310. The district court instructed the jury under a "right to control" theory that if the nonprofit was "deprived of potentially valuable economic information that it would

_____

[5] As during trial, Crump continues to construct portions of her argument not just from the decision in *Ciminelli*, but also from the Solicitor General's brief in that case. A losing brief is not persuasive (much less controlling) authority. *Cf.* Michael R. Dreeben, *Stare Decisis in the Office of the Solicitor General*, 130 Yale L. J. Online (Jan. 15, 2021), https://www.yalelawjournal.org/forum/stare-decisis-in-the-office-of-the-solicitor-general ("[The Solicitor General's] positions are statements of advocacy, and not binding law.").

consider valuable in deciding how to use its assets" Ciminelli could be found guilty under 18 U.S.C. § 1343. *Id.* at 310–11.

The scheme alleged here was conceived to directly deprive individuals of money, not intangible notions of valuable information. Money is undoubtedly a "traditional property interest." That magazines may have been delivered does not alter the fact that wrongful deprivation of money would be a wrongful deprivation of a traditional property interest. It would create an untenable loophole in the federal fraud statutes to allow individuals to make material misrepresentations attempting to deprive others of their money simply because a defendant provides some nominal good or service in return. The Court will decline to endorse such a change absent instruction from the Eighth Circuit.

The Defendants also argue that their instruction accords with the limitations other courts of appeals have placed on the federal fraud statutes. *See, e.g.*, *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168. Two points are worth noting here. First, *Takhalov* and its corollaries predate the most recent edition of the Eighth Circuit's model instructions. Unlike *Ciminelli*, the Eighth Circuit committee had the benefit of those cases while revising multiple editions of the model jury instructions. The committee has continued to provide model instructions that accord with Eighth Circuit law, which does not require an instruction excusing material falsehoods.

Second, the central holding of *Takhalov* was that "a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick. . . .  For if there is no intent to harm, there can only be a scheme to deceive, but not one to defraud."  827 F.3d at 1313 (emphasis omitted). The jury was so instructed, and so found, here.  (*See* Jury Instructions at 67, 72.)

### C.    Constitutionality

A criminal statute must "'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *United States v. Orchard*, 332 F.3d 1133, 1137–38 (8th Cir. 2003) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  A party may challenge a statute on vagueness grounds by arguing either that the statute is vague as applied to the conduct at issue, or that the statute is facially vague.  *See Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438–39 (8th Cir. 1998). The Defendants levy an as applied challenge, claiming they were not on notice of a possible federal prosecution because the government overstepped into traditionally civil and state matters.

The Court will join the Seventh Circuit in rejecting the notion that consumer fraud is the exclusive province of civil actions and state enforcement.  *See United States v. Hausmann*, 345 F.3d 952, 958–59 (7th Cir. 2003).  As to the Defendants' claim that their prosecution improperly "federalizes traditionally state matters," *see Ciminelli*, 538 U.S. at 316, the Supreme Court primarily takes issue with federal fraud prosecutions policing the

actual operation of state government. *See id.* at 309–10, 316 (awarding of state contracts); *Cleveland v. United States*, 531 U.S. 12, 26–27 (2000) (awarding of licenses in regulated industry); *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020) (operating bridges).[6] This case does not concern federal intrusion into a state's internal operations. And the fact that state attorneys general often have consumer protection divisions does not categorically preempt the federal government from prosecuting consumer fraud schemes.

## V.   CRUMP'S MOTIONS

While the Court has addressed most of Crump's arguments in this order, Crump continues to investigate devices seized from RCHO, the contents of which were not fully produced by the government. The ongoing investigation has delayed briefing on potential discovery and *Brady* issues. That investigation did not affect any of the arguments Crump raised in her Motion for Acquittal, which the Court will deny in this order. Also unaffected are Parts II and III of her Motion for a New Trial, which the Court will deny. The Court will reserve judgment only on the discovery and *Brady* issues raised in Part I of her Motion for a New Trial. (*See* Order Den. Def.'s 2nd Extension Request, Dec. 21, 2023, Docket No. 2135.) Pursuant to the timeline outlined in Crump's letter to the Court, the Court will allow Crump to file a supplemental brief when her review of the devices is complete, no

---

[6] What is more, the would-be presumption against federalization is used as a statutory interpretation tool in those cases rather than as an outright constitutional holding.

later than May 24, 2024.  (*See* Letter to the Court at 2, Feb. 23, 2024, Docket No. 2214.)

The government will be allowed two weeks to respond.

## CONCLUSION

Because the evidence weighed in favor of the jury's verdict, because the evidence

the jury considered was admissible, because the jury was properly instructed, and

because the prosecution was constitutional, the Court will deny Defendants' post-trial

motions almost in full.  The Court will reserve judgment on Part I of Crump's Motion for

New Trial.  And the Court will grant Miller's motion for acquittal of Count 26, in which the

government did not prove the charged email crossed state lines.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendant Amondo Antoine Miller's Motion for Acquittal [Docket No. 2069] is

    **GRANTED in part** and **DENIED in part**;

2.  Defendant Amondo Antoine Miller's Motion for New Trial [Docket No. 2071] is

    **DENIED**;

3.  Defendant Amondo Antoine Miller is Acquitted of Count 26 (Wire Fraud);

4.  Defendant Tashena Lavera Crump's Motion for Acquittal [Docket No. 2150] is

    **DENIED**;

5.  Defendant Tashena Lavera Crump's Motion for New Trial or Dismissal [Docket

    No. 2151] is **DENIED in part and DEFERRED in part;**

6.   Defendant Tashena Lavera Crump supplemental brief is due by May 24, 2024;

and

7.   Defendant Ballam Hazeakiah Dudley's Motion for Acquittal [Docket No. 2072]

is **DENIED**;

DATED:  May 14, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge